IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 30, 2021 Session

## WILLIAM CASEY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sullivan County**
**No. C65101  James F. Goodwin, Jr., Judge**

———————————————————

### No. E2020-00701-CCA-R3-PC

———————————————————

The Petitioner, William Casey, appeals the post-conviction court's denial of his petition for post-conviction relief in which he challenged his convictions for first degree criminal sexual conduct and two counts of aggravated rape for offenses that occurred in 1979 and 1980.  On appeal, the Petitioner asserts that he received ineffective assistance of counsel at trial and on direct appeal, that the post-conviction court erred in failing to rule upon his motion in limine seeking to exclude the State from presenting any evidence protected by attorney-client privilege, and that the Petitioner is entitled to relief due to cumulative error.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Francis X. Santore, Jr., Greenville, Tennessee, for the appellant, William Casey.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; and Barry P. Staubus, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The Petitioner's 2011 convictions stem from his sexual abuse of the victim in the late 1970s and in 1980 while the then-juvenile victim was attending a school associated with the Catholic church where the Petitioner was head priest.  The evidence presented at

trial established that the Petitioner engaged in sexual acts with the victim on three separate occasions when the victim was thirteen and fourteen years old. The victim disclosed the abuse to family members in 1999, 2001, and 2009, to Ms. Ann Brentwood with Survivors Network of Those Abused by Priests ("SNAP") in June 2009, and to the Kingsport Police Department in April 2010.

On August 21, 2010, the Petitioner was charged through a presentment in Count One with first degree criminal sexual conduct alleged to have occurred between May 22, 1978, and May 20, 1979; in Count Two with aggravated rape alleged to have occurred between March 1 and April 15, 1980; and in Count Three aggravated rape alleged to have occurred between March 1 and April 15, 1980. At the time of the offense in Count One and as related to the present case, the offense of first degree criminal sexual conduct was defined as sexual penetration of another where the victim was at least thirteen but less than sixteen years old and the defendant was at least three years older than the victim, was "in a position of custodial or official authority over the victim," and "used this authority to coerce the victim to submit." T.C.A. § 39-3703(A)(2) (1978); *see State v. William Casey*, No. E2012-01451-CCA-R3-CD, 2014 WL 325148, at *13 (Tenn. Crim. App. Jan. 28, 2014), *perm. app. denied* (Tenn. June 20, 2014) (designated not for citation). The conviction for first degree criminal sexual conduct was subject to a maximum punishment of life imprisonment. T.C.A. § 39-3703(B) (1978); *see State v. Washington*, 661 S.W.2d 900, 904 (Tenn. Crim. App. 1983). Effective June 5, 1979, the statute was amended to replace the offense of first degree criminal sexual conduct with the offense of aggravated rape. *See* T.C.A. § 39-3703 (1979); *Washington*, 661 S.W.2d at 904-05. As related to the present case, aggravated rape was defined as the unlawful sexual penetration of another where the victim was at least thirteen but less than sixteen years old and the defendant was "in a position of custodial or official authority over the victim." T.C.A. § 39-3703(A)(4) (1979); *see William Casey*, 2014 WL 325148, at *13. The offense of aggravated rape likewise carried a maximum sentence of life imprisonment. *See* T.C.A. § 39-3703(B) (1979); *Washington*, 661 S.W.2d at 904-05.

Much of the litigation prior to and at trial revolved around the victim's delay in reporting the abuse. The defense argued in pretrial proceedings that the "pre-accusatorial" delay violated the Petitioner's due process rights. At trial, the defense utilized the delay in an effort to discredit the victim's claims of abuse.

There was also pretrial litigation regarding the dates of the offenses due to the fact that the statutes governing sexual abuse cases underwent multiple amendments during the late 1970s and early 1980s. The defense argued that Tennessee Code Annotated section 39-3703 was amended effective April 16, 1980, to remove the provision that the victim was at least thirteen but less than sixteen years old and the defendant was "in a position of custodial or official authority" over the victim as a circumstance that enhanced

unlawful sexual penetration of another to aggravated rape. The defense unsuccessfully argued that the offenses occurred after the effective date of the 1980 amendment; that the appropriate charges were rape pursuant to section 39-3705 (1980), which carried a sentence of five to twenty years in prison; and that, thus, the statute of limitations for the rape charges had expired.

## Pretrial Proceedings

Prior to trial, the Petitioner filed a motion to dismiss, arguing in part the issues regarding pre-accusatorial delay and the statute of limitations. He also filed a motion for a bill of particulars. The State filed multiple responses to the request for a bill of particulars, setting forth the basis for each count in the presentment. According to the State, Count One related to the Petitioner's masturbating the thirteen-year-old victim and then anally penetrating the victim with his penis while in the rectory when no one else was present. Count Two related to the Petitioner's anally penetrating the victim with his penis while in the rectory when no one else was present. The State stated that the victim recalled that the offense occurred in March or early April of 1980 and before his birthday on May 21, 1980, when the Petitioner requested that the victim come to his room so that he could give the victim a medallion as a birthday gift. According to the State, Count Three related to an act of sexual penetration that occurred while at the victim's home, while school was still in session, after the offense during which the Petitioner gave the victim a medallion, and when the victim was fifteen years old.

During the hearing on the motion to dismiss, the victim, who was forty-five years old at the time of the hearing, testified that in the mid-1970s and when the victim was in the fifth grade, the Petitioner became the head pastor at St. Dominic's Catholic School and Church in Kingsport, Tennessee, where the victim attended school and served as an altar boy. The victim stated that the Petitioner began a sexual relationship with him when the victim was ten and one-half to eleven years old and living with his mother in Kingsport. The relationship ended when the victim moved to Louisville, Kentucky, to live with his father in April 1981, shortly before his sixteenth birthday in May.

The victim explained that he did not report the abuse between the ages of ten and fifteen because his mother had told him that she and the Petitioner were in love and that the Petitioner was leaving the priesthood to marry her. The victim stated that he also did not think that anyone would believe him. The Petitioner told the victim that he was very reverent, which the victim explained meant that the Petitioner was next in line to a bishop and a very powerful priest. The victim was taught that a priest "represented God on [E]arth." The victim stated that in contrast, he was a "poor kid from almost the wrong side of the track." The victim said he did not disclose the abuse when he was a child "out

of fear, shame, guilt, [and] confusion," and due to the relationship between the Petitioner and his mother. He believed the abuse was his fault and feared being mocked.

The victim testified that the Petitioner told him their friendship and love were "special," that the victim was "special," and that no one else would understand their relationship. On more than one occasion when the victim was thirteen years old, the Petitioner told him that no one would understand their "special love" and that the victim's mother would be hurt if the victim disclosed it. The victim stated that as a result, he considered disclosure to be "out of the question." The Petitioner took the victim to places where his mother could not afford to take him and gave him gifts, such as a medallion and ten shares of Piedmont Airline stock. The Petitioner paid the victim for mowing the grass at the church and for tending funerals.

The victim agreed that one of the allegations was that the Petitioner penetrated him at the trailer where the victim lived with his mother. The victim recalled that other boys who lived in the trailer park would mock the victim whenever the Petitioner came to the victim's home. The Petitioner told the victim that he should not tell the boys about their "special friendship," that the boys would not understand, and that they were not "special" like the victim.

Shortly before the victim's sixteenth birthday, he moved to Louisville to live with his father because his mother could no longer control him and his misbehavior resulted in a period of five days in jail. The victim testified regarding the various reasons that he did not disclose the abuse to family members and friends. He explained that he did not disclose the abuse due to a feeling of shame and fear that he would be mocked and that no one would believe him. The victim explained that he was a "nobody kid" and that the Petitioner was "powerful" and "commanded the whole place; the church, the school, the gym, cafeteria, everything."

The victim testified that he disclosed the abuse to his third wife in 1999 at the age of thirty-four after he watched a documentary about priests who had abused altar boys. He stated that his wife was shocked and instructed him to tell his mother about the abuse. He explained that he did not go to the police at that time because he did not trust anyone. The victim disclosed the abuse to his mother during the summer of 2001 when she visited his home in Indiana. The victim testified that his mother told him that he should seek counseling from a priest or a pastor, that he should "leave it to God," and that he should not pursue any action against the Petitioner. The victim stated that he was "shocked" and that "[i]t set [him] back" because he believed his mother would support him and offer help. In May 2009, the victim disclosed the abuse to his father, who was "speechless" for awhile and then told the victim to forget about the abuse and "move on." The victim testified that he was "spiraling out of control" and "self-destructing" and that he reached

out to Ms. Ann Brentwood with SNAP, disclosing the abuse to her in June 2009. He stated that Ms. Brentwood, who was deceased at the time of the hearing, was the first person who advised him to report the abuse to law enforcement.

On September 10, 2009, the victim disclosed the abuse to Detective Jennifer Trantham of the McDowell County Sheriff's Department in North Carolina. On the same day and based upon a request from Detective Trantham, the victim called the Petitioner, and the victim stated that he recognized the Petitioner's voice. A transcript of the recording was introduced as an exhibit at the hearing. According to the transcript, the victim and the Petitioner discussed the problems with the victim's prior marriages and his relationship with his mother. The victim questioned whether he was homosexual and asked the Petitioner whether he had been attracted to the victim because the Petitioner believed he was homosexual. The Petitioner replied, "No, I just loved you like my son." The victim asked the Petitioner whether he and the victim's mother were ever involved in a relationship, and the Petitioner denied such a relationship. The Petitioner told the victim, "I mean I was always faithful to you. You were my friend. I did love you." The victim stated that he had wondered "why would [the Petitioner] be with me and then be with her." The Petitioner replied, "You were the only one." He told the victim, "We're friends in a way that nobody else has ever filled." The Petitioner told the victim that when the victim grew up and went away, "I just had to let go. I was obsessive a little bit, too I think."

The victim also prepared a written statement of "Memories" that was entered as an exhibit during the hearing. The "Memories," which were revised in August of 2009, detailed instances of sexual abuse by the Petitioner from 1975 through 1980 that occurred in Kingsport, Tennessee; Greenville, Tennessee; North Carolina; and Virginia. The victim listed one instance of sexual abuse as occurring in the church rectory in approximately 1976 or 1977 when the victim was eleven and one-half to twelve years old. The victim provided in the statement that the document would be revised "[a]s more memories of places and events occur to me."

On April 14, 2010, the victim went to the Diocese of Knoxville and disclosed the Petitioner's abuse to Deacon Sean Smith and a Catholic nun. The victim gave them a copy of his written "Memories" and a copy of the transcript of his telephone conversation with the Petitioner. The victim testified that Detective Trantham had given him the transcript and that broken equipment had caused a delay in the preparation of the transcript. On the following day, the victim filed a report with the Kingsport Police Department, and he gave a statement to Detective Chris Tincher on April 28, 2010. The victim subsequently made disclosures to law enforcement officers in Scott County, Virginia, and Greene County, Tennessee.

On cross-examination, the victim testified that when he first met with Ms. Brentwood, they discussed the abuse by the Petitioner and the fact that it occurred in multiple jurisdictions. The victim denied that anyone instructed him on the jurisdictions where he should first report the Petitioner's abuse. He believed he suggested that he should first report to North Carolina because it was the furthest away from him and that Ms. Brentwood agreed with him. The victim agreed that no one had prevented him from reporting the abuse to law enforcement prior to his meeting with Detective Trantham in September 2009.

The victim testified that Ms. Brentwood suggested he write down his memories of the abuse as means of helping him heal. The victim's original "Memories" document was handwritten. He subsequently shredded the document and prepared another draft. He explained that he learned in college that "you write three drafts of a paper and your final draft is your third draft." Defense counsel questioned the victim about a handwritten change made in the "Memories" typewritten document noted as "Revised 8-09" regarding the years during which the Petitioner abused the victim in Greenville. The victim stated that it was a "small change" and that it was possible that he made the change after he incorrectly typed the dates. He maintained that he made the change in August of 2009 before meeting with prosecutors.

The victim testified that "it was always understood" that the statute of limitations would bar him from prosecuting the Petitioner. The victim stated that someone from the District Attorney General's office informed him that he had a right to file the report and that they would review it. The victim agreed that someone had informed him of the effective date on which either the law or the applicable statute of limitations had changed, and the victim believed Detective Tincher was the first person who informed him of the change. The victim did not know when he learned that the Petitioner could be prosecuted in Tennessee.

The victim testified that he revised his "Memories" statement on April 26, 2010, two days before he met with Detective Tincher. The victim stated that he had spoken to Detective Tincher prior to April 28th only for the purposes of scheduling the meeting. The victim said he did not know whether he had spoken with Detective Tincher on the date on which he revised his memories, but the State stipulated that the victim had spoken with the detective on that date. In the "Memories" statement, the victim changed the date on which the abuse in the rectory occurred from "1976 through 1977," when he was eleven and one-half to twelve years old, to "1977 through 1979," when he was eleven and one-half to fourteen years old. The victim also changed the statement that the abuse occurred "[a]t least once" in the rectory to "[a]t least twice." The victim explained that he revised his written memories because he was in therapy and that he had always reserved the right to revise the document "as more memories came to [him] from therapy

- 6 -

in the future." He said he began therapy regarding the abuse in August 2009 after meeting with Ms. Brentwood. He denied that Ms. Brentwood assisted him in drafting the "Memories" document. He acknowledged that he was unable to recall the specific dates on which the acts of abuse occurred.

Father David Boettner, the Vicar General of the Diocese, testified that on April 14, 2010, the victim and a representative from SNAP met with Deacon Smith at the Diocese, and the victim recounted what had occurred years earlier with the Petitioner. Father Boettner was not present for the meeting. Later that evening, Father Boettner, Deacon Smith, and Bishop Stika met with the Petitioner at the Bishop's residence. Father Boettner stated that the Petitioner was not threatened, did not appear to be intoxicated, and was there voluntarily. Father Boettner said that Deacon Smith read the victim's written memories to the Petitioner and asked him if there was any "credibility" to the victim's account. Father Boettner recalled that the Petitioner responded that "there was credibility to it although he didn't agree with all the details." Father Boettner testified that when Deacon Smith asked the Petitioner whether he had oral and anal sex with the victim, the Petitioner responded, "Unfortunately I'm guilty." On cross-examination, Father Boettner testified that during the meeting, the Petitioner was given a letter from Bishop Stika dismissing him from active ministry. At the time of the meeting, Father Boettner was unaware of any criminal charges against the Petitioner.

The State presented the expert testimony of Ms. Sue Frazier-Bear, a therapist with the Children's Advocacy Center, regarding the delay of reporting sexual abuse by child victims and the various factors that contributed to victims waiting until adulthood to report child sexual abuse. The State also sought to introduce the Petitioner's July 2011 conviction in North Carolina for a crime against nature for an offense against the victim that occurred between May 1, 1977, and August 1, 1978. The trial court initially denied the State's request to introduce the conviction, agreeing with the Petitioner that the conviction was not relevant. However, after taking the matter under advisement, the trial court reversed its decision regarding the admissibility of the Petitioner's North Carolina conviction and stated that it considered the conviction in reaching its decision concerning pre-accusatorial delay.

In deciding the issue of pre-accusatorial delay, the trial court considered several factors, including the length of the delay, the reasons for the delay, and the degree of prejudice to the Petitioner. The trial court found that the length of the delay was approximately thirty-one years and that the date on which the abuse was alleged to have begun was thirty-four and one-half to thirty-five years prior to the victim's reporting the abuse to authorities. The trial court reviewed the reasons for the delay as testified to by the victim and found that the reasons were "logical." The trial court found that the delay posed no prejudice to the Petitioner. While acknowledging that the defense presented a

list of individuals who had since become deceased and would have witnessed interactions between the Petitioner and the victim at the time the abuse was alleged to have occurred, the trial court found that nothing suggesting that any of the individuals would have been able to testify that the Petitioner and the victim were never alone together. The trial court stated that in reviewing the victim's written memories, the victim had "a pretty significant recollection of the events." The trial court also stated that it appeared that the Petitioner's memories had not faded and that when confronted by Catholic authorities, the Petitioner acknowledged that the victim's memories were credible. The trial court noted that although the Petitioner and the victim had not seen each other for approximately twenty years prior to the recorded telephone call, "reading that transcript it would appear to me that it was as if they'd just seen each other." The trial court also noted that the victim's memories also included an incident that occurred in North Carolina and that the Petitioner's pleading guilty to the incident failed to support the Petitioner's claim of faded memories.

The trial court noted that at the time that the incidents were alleged to have occurred, the charged offenses carried a possible sentence of life imprisonment and, therefore, did not have a statute of limitations. The trial court found insufficient evidence that the victim changed the dates in his written memories for the purpose of fitting the incidents within the time period during which the offenses did not have a statute of limitations and, thus, avoiding the application of a subsequent statutory amendment that imposed a statute of limitations. Accordingly, the trial court denied the Petitioner's motion to dismiss.

The Petitioner filed a renewed motion and a second renewed motion to dismiss the indictment, in which he sought to reopen the hearing in light of the State's production of two statements given by the victim to law enforcement. The Petitioner sought to reexamine the victim and call additional witnesses based on the statements. He also argued that the State asserted in the bill of particulars that Count 3 charging aggravated rape occurred when the victim was fifteen years old, that the victim's fifteenth birthday was in May 1980, after the effective date of the amendment to Tennessee Code Annotated section 39-3703, that the amendment resulted in reducing the aggravated rape charge to rape, and that the charge of rape is barred by the statute of limitations. The Petitioner argued with respect to all of the charges that the victim modified the dates in his written memories after speaking to officers at the Kingsport Police Department so that the charges would fall within section 39-3703 prior to the 1980 amendment and, thus, not be barred by the statute of limitations.

The trial court denied the Petitioner's request to reopen the proceedings to further examine the victim, stating that the defense could question the victim about his prior statements at trial. However, the trial court allowed the parties to present testimony from

Detective Chris Tincher in relation to the Petitioner's claims regarding the victim's modification of his written memories.

Kingsport Police Detective Chris Tincher testified that he first discussed the allegations against the Petitioner with the victim on April 28, 2010, at the Kingsport City Justice Center. Detective Tincher informed the victim that after taking his statement, he would submit a report to the District Attorney General's Office and that the prosecutors would determine whether any charges could be brought against the Petitioner. On June 9th, Detective Tincher took a written statement from Deacon Smith, and Detective Tincher submitted a written report to the District Attorney General's Office on July 1st. Detective Tincher stated that he was unaware of the applicable statute of limitations when he submitted the report and that the prosecutors later notified him of the statute of limitations. Detective Tincher denied suggesting to the victim the offense dates which would allow the Petitioner to be prosecuted.

On cross-examination, Detective Tincher testified that when the victim first came to the Kingsport Police Department on April 15th, he spoke to a patrol officer. Detective Tincher testified that neither he nor the victim initially believed that charges could be brought against the Petitioner in Tennessee. Detective Tincher did not believe he was the first person to tell the victim that it was possible to prosecute the Petitioner for the offenses. Detective Tincher stated that according to his supplemental police report, on April 29th, he contacted a prosecutor who stated that based upon her research, there were at least two incidents that possibly could be prosecuted as criminal sexual contact in the first degree. According to the prosecutor, both incidents involved the Petitioner penetrating the victim anally while in the Petitioner's living quarters when the victim was thirteen and fourteen years old.

The trial court rejected the Petitioner's claim that the victim modified his written statements to fall within prior law that had no statute of limitations, and it rejected the Petitioner's claim that the 1980 statutory amendment applied such that the charges were barred by the statute of limitations. The trial court noted that the State did not concede that the victim was fifteen years old when the incident forming the basis for Count 3 occurred, that the statute of limitations was an element of the offenses, and that the court would dismiss the charge if the State failed to prove at trial that the offense occurred within the applicable time period.

Shortly before trial, the State filed an amended response to the Petitioner's motion for a bill of particulars, stating that the State was mistaken in its previous response that the victim was fifteen years old at the time of the incident forming the basis for Count 3 and that the victim never alleged that he was fifteen years old at the time of the offense. The State noted that in the victim's written statement, he had described another incident

that occurred at the age of fifteen while in the Petitioner's vehicle parked at the bottom of the hill leading up to the trailer park where the victim had lived. The State stated that this "subsequent and uncharged incident" was the basis for the State's mistaken claim that the victim was fifteen years old when the incident forming the basis for Count 3 occurred.

**Trial Proceedings and Direct Appeal**

Shortly prior to trial, the Petitioner filed a motion pursuant to Tennessee Rule of Evidence 404(b) seeking to exclude any evidence of his conviction in North Carolina and any evidence of uncharged offenses alleged to have been committed by the Petitioner against the victim that occurred outside of Sullivan County or outside of the time frames specified by the presentment and by the bill of particulars. On the morning of trial, the State announced that it did not intend to introduce evidence of the North Carolina conviction in its case-in-chief unless the defense opened the door to such evidence. The defense also objected to the introduction of the evidence for purposes of impeachment pursuant to Tennessee Rule of Evidence 609 if the Petitioner chose to testify at trial. The trial court declined to rule on the Rule 609 issue at that time, finding that such a ruling would be premature.

At trial, the victim testified that he first met the Petitioner when the victim was ten and one-half years old and the Petitioner was in his forties, after the Petitioner became the head priest at the Catholic Church and elementary school which the Petitioner attended. The Petitioner chose the victim to be an altar boy and gave him a job mowing the grass on the church's grounds. After the victim graduated from the elementary school, he continued to see the Petitioner two to three times per week. The victim's family was poor, and he was being raised by a single mother who worked seven days per week and attended nursing school. As a result, the victim often was alone. His mother rarely had transportation, so the victim either walked or relied upon the Petitioner to drive him places. The Petitioner gave the victim money for mowing grass at the church or for performing additional duties as an altar boy. The Petitioner also gave the victim gifts, such as ten shares of stock, a medallion, a stamp collection, small rocks, a small ring, and a Bible. The Petitioner took the victim to a putt-putt golf facility, a movie theater, and on small trips. The Petitioner took the victim on day trips to Virginia and to Gatlinburg, Tennessee, and on overnight trips to the Petitioner's cabin in Greeneville, Tennessee, and to a gem mine in North Carolina. During the overnight trips, the Petitioner and the victim slept in the same bed. The Petitioner also visited the victim at the victim's home.

The victim testified that to his knowledge, his mother never provided any restrictions regarding the interactions between the Petitioner and the victim and that neither his mother nor anyone else objected to his traveling with the Petitioner. The victim stated that his mother encouraged his trips with the Petitioner and encouraged the

victim to be obedient to the Petitioner. The victim believed the Petitioner had "[a]bsolute" authority over the victim. The victim agreed that his perception was that he was not to object to the Petitioner's instructions and to trust him. The victim never argued with or disobeyed the Petitioner during this time period. Rather, the Petitioner provided the victim with counsel and acted as the victim's father figure. The victim testified that the Petitioner described himself to the victim as "a representative of God" and that he was "the next thing to a [b]ishop." As a result, the victim viewed the Petitioner as a powerful man, who was a "representative of God on [E]arth." The victim believed the Petitioner had the authority to tell him what to do.

The victim testified that his relationship with the Petitioner became sexual, including acts of sexual penetration in Sullivan County, and that the Petitioner performed oral and anal sex on him. The victim stated that the Petitioner told the victim that he was "special" and that the acts were "our special love, a special way of showing our love for each other." The prosecutor questioned the victim regarding each specific count in the presentment, read each count individually, and informed the victim that the prosecutor's questions about the sexual abuse were limited to each specific count.

The victim testified that the acts relating to Count 1 occurred in the rectory of the church when he was thirteen years old. After the victim mowed, the Petitioner asked him to come down to the basement of the rectory, which was the priest's private quarters. The victim believed it was "cool" because the public was not allowed to be in the area. The victim stated that after the Petitioner locked the doors, the Petitioner put his arm around the victim and led him to the Petitioner's bed. The Petitioner unzipped the victim's pants, removed his pants and underwear, and instructed the victim to lie down on the bed. The Petitioner lay down on his side and behind the victim and performed anal sex on the victim while masturbating him. The Petitioner ejaculated inside the victim, and the victim bled. The Petitioner gave the victim a towel and tried to clean him up. The victim went into the bathroom and closed the door. After a few minutes, the Petitioner came to the door and asked the victim if he was all right. Once the victim came out of the bathroom, the Petitioner drove him home. The victim stated that the incident occurred after business hours and while no one else was in the area.

The victim testified that he did not consent to the sexual acts and did not want to participate in them. He explained that he did not believe he had a choice because the Petitioner was a powerful man in the community and had the permission of the victim's mother to take the victim anywhere the Petitioner wanted. The victim recalled that at some point, the Petitioner instructed him not to tell anyone, stating that the victim's mother would be hurt if the victim did so. The Petitioner also told the victim that no one would believe him, and the victim explained that he did tell anyone because he also thought that no one would believe him.

- 11 -

The victim testified that the act related to Count 2 occurred when he was fourteen years old and shortly before his fifteenth birthday. He recalled that the Petitioner wanted to give him a medallion and that he accompanied the Petitioner to the rectory to retrieve the gift. The victim said the Petitioner again performed anal sex on him while masturbating him on the Petitioner's bed. The victim stated that the Petitioner initiated the sexual episode and that the victim did not want to participate. The doors to the rectory were locked, and the Petitioner and the victim were alone when the incident occurred.

The victim testified that the act related to Count 3 occurred after the act related to Count Two and while he was still fourteen years old. The victim recalled that the Petitioner came to the trailer where the victim was living with his mother and while his mother was not at home. The Petitioner told the victim that his mother had sent him to speak to the victim about his unruly behavior. They sat on the couch where the Petitioner spoke to him about his mother's concerns. The victim stated that they ended up on the floor in front of the couch where the Petitioner performed oral sex on the victim. The victim said he felt obligated to perform oral sex on the Petitioner. The victim stated that it was the Petitioner's idea to engage in sex and that the victim did not want to do so. The Petitioner instructed the victim not to tell the other boys who lived in the trailer park and told the victim that "they weren't special" like the victim.

The victim testified regarding the disclosure of the abuse to family members and to Ms. Brentwood after the victim became an adult, as well as his explanation for failing to disclose the abuse while he was a teenager. The victim testified that he did not tell his mother of the Petitioner's abuse because she once told him that she and the Petitioner were in love. Defense counsel objected to the testimony, and the trial court sustained the objection. The victim then testified that he believed his mother and the Petitioner shared a close relationship based upon his observations and that he did not think his mother would believe him as a result. The victim recalled attending counseling as a result of his unruly behavior as a teenager at his mother's request and the Petitioner's waiting outside the door during the counseling sessions.

The victim testified regarding his reporting the abuse to Deacon Smith on April 14, 2010, and to the Kingsport Police Department on the following day. The victim also testified regarding his telephone call to the Petitioner, which was recorded by a law enforcement officer. The recording of the telephone call was entered as an exhibit at trial. The defense objected to the portion of the recording during which the victim and the Petitioner discussed the relationship between the Petitioner and the victim's mother. The State responded that the Petitioner denied a romantic relationship with the victim's mother and that the conversation was "part and parcel" of the Petitioner's admission.

The trial court overruled the defense's objection, noting that the discussion was part of the conversations during which the Petitioner told the victim that he was "the only one" and that the discussion regarding relationship between the Petitioner and the victim's mother was relevant to the context of the Petitioner's admission.

On cross-examination, the defense questioned the victim extensively regarding his delay in reporting, his prior statements regarding the abuse, and the influence of Ms. Brentwood and SNAP regarding his decision to report the abuse and seek prosecution of the Petitioner. The victim could not recall the exact date on which the incident forming the basis for Count 1 occurred but recalled that he was in the sixth grade. The victim maintained that he told an officer in September 2009, that an incident of abuse occurred "at least" once in the church rectory, but the victim acknowledged that his written statement did not include the term "at least."

The victim acknowledged that in September 2009, he told a law enforcement officer that none of the instances of abuse ever occurred in the home where he lived with his mother. The victim stated that the first officer whom he told about the instance of abuse upon which Count 3 was based was Detective Tincher. The victim explained that his memories developed as a result of therapy. He agreed that another incident of abuse occurred in the Petitioner's car at the rear entrance of the trailer park where he lived. The victim stated the incident occurred when he was fifteen years old and at a different time when the incident inside the victim's trailer occurred.

The victim testified that he met Ms. Brentwood in June 2009 and that she accompanied him to report the abuse to law enforcement. She also was present when the victim called the Petitioner. Another representative of SNAP accompanied the victim to the Kingsport Police Department. The victim recalled discussing the applicable statute of limitations with both Detective Tincher and a prosecutor at some point prior to trial, but the victim did not recall discussing the topic with them before he gave his statement to Detective Tincher. The victim stated that no one mentioned the date of April 15, 1980, with him or its importance.

On redirect examination, the victim testified that he told officers that his memories were slowly returning and that memories could continue to resurface as his therapy continued. He recalled providing the officers with a statement that he had written prior to meeting with the officers in which he stated that an incident of abuse occurred in the church rectory on two separate occasions. The victim stated he told Detective Tincher that he was thirteen years old when the first incident occurred and was fourteen years old when the second incident occurred.

The victim stated that he told Detective Tincher that he was fourteen years old when the Petitioner penetrated him in the trailer, that the written statement had provided that the victim was fifteen years old, and that the written statement was corrected. The statement also differentiated the incident that occurred inside the trailer from a separate incident that occurred in the Petitioner's car while parked at the bottom of a hill inside the trailer park.

The State offered the testimony of Father Boettner, whose testimony at trial regarding the meeting with the Petitioner regarding the allegations was consistent with his testimony during the pretrial hearing. Father Boettner testified that after the "Memories" document was read to the Petitioner and he was asked whether there was any credibility to the document, the Petitioner replied, "Unfortunately, but not all the specifics." On cross-examination, Father Boettner acknowledged that prior to the meeting with the Petitioner, he prepared a letter suspending the Petitioner from his duties.

Deacon Smith also testified at trial regarding the meeting. He recalled that on April 14, 2010, he met with the victim, who provided him with information regarding the Petitioner's abuse and a written document prepared by the victim and referred to as his "Memories." Later that evening, Deacon Smith, Father Boettner, Bishop Stika, and another bishop met with the Petitioner at Bishop Stika's home. Deacon Smith read the memory statement to the Petitioner, and Bishop Stika asked him whether there was any credibility to the allegations. The Petitioner replied, "Yes, unfortunately but not necessarily all the specifics." Deacon Smith asked the Petitioner if he masturbated with the victim and if he had oral and anal sex with the victim, and the Petitioner responded, "I'm guilty." The Petitioner apologized for his actions, and Deacon Smith provided him with a suspension letter.

On cross-examination, Deacon Smith acknowledged that in his statement to the police, he stated that he asked the Petitioner if he touched the victim's penis, performed oral sex, "or" performed anal sex and that the Petitioner relied, "Yes." On redirect examination, Deacon Smith explained that he did not have his notes of his meeting when he made the statement to the police and that according to his notes, Deacon Smith stated "and" rather than "or."

After the State rested, the trial court held a jury-out hearing regarding the admissibility of the Petitioner's conviction from North Carolina. The trial court excluded the conviction as impeachment evidence pursuant to Tennessee Rule of Evidence 609. With regard to the admissibility of the evidence as a prior bad act pursuant to Rule 404, the trial court noted that the State declined to present the conviction in its case in chief. The trial court noted that if the Petitioner elected to testify, the conviction "might become relevant" depending upon the Petitioner's testimony but that the trial court could not rule

- 14 -

on its relevance and admissibility until the Petitioner testified. The Petitioner elected not to testify in his own defense.

The trial court instructed the jury that in order to find the Petitioner guilty of the offenses, the jury must find that the State had proven beyond a reasonable doubt that each offense occurred during the time period alleged for each count in the presentment. The trial court also instructed the jury that as to Count 3, the State elected to rely upon the Petitioner's performing oral sex on the victim while in the victim's trailer. The jury convicted the Petitioner of first degree criminal sexual conduct and two counts of aggravated rape. The trial court imposed an effective thirty-five-year sentence.

The Petitioner filed a motion for new trial, raising eighty-nine issues, and the trial court denied the motion following a hearing. On direct appeal, the Petitioner argued that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in denying his motion to dismiss because the "pre-accusatorial" delay violated his due process rights; (3) the trial court erred in denying his motion to reopen the hearing to allow for further cross-examination of the victim based upon the victim's additional statements to police; (4) the trial court erred in failing to give special jury instructions defining "coercion" and informing the jury that the victim's testimony must be corroborated; and (5) the trial court erred in failing to grant a mistrial due to improper comments by the trial court and the State. *See William Casey*, 2014 WL 325148, at \*13-25. As part of his argument regarding the trial court's failure to reopen the pretrial hearing, the Petitioner also alleged that the trial court erred in admitting and considering the Petitioner's North Carolina conviction, his telephone call with the victim, and his statements to Father Boettner. *Id.* at \*19. This court affirmed the Petitioner's convictions on direct appeal. *Id.* at \*1.

## Post-Conviction Proceedings

The Petitioner, through counsel, filed a petition for post-conviction relief, raising eighty-one claims, including seventeen claims of error at the trial level, eight claims of prosecutorial misconduct, sixteen claims of ineffective assistance of counsel at trial, and forty claims of ineffective assistance of counsel on appeal. The post-conviction court entered a preliminary order dismissing all of the Petitioner's claims except for nine claims of ineffective assistance of counsel at trial.

During the evidentiary hearing, the Petitioner proceeded on three grounds of ineffective assistance of counsel at trial: (1) the failure to investigate whether the Petitioner was posted to the victim's church during the time the abuse allegedly began; (2) the failure to call witnesses to rebut the victim's claims regarding his status as an altar boy and the layout of the rectory; and (3) the failure to investigate whether records

documented the Petitioner's location during the time period in which the crimes were committed in an effort to develop defenses. The Petitioner presented the testimony of three witnesses, who denied ever witnessing the Petitioner engaging in inappropriate behavior. The post-conviction court allowed the Petitioner to enter his daily calendars for the time period during which the abuse occurred as an exhibit for identification purposes only. The post-conviction court entered an order denying the Petitioner's claims of ineffective assistance of trial counsel presented during the evidentiary hearing.

On appeal, the Petitioner asserted that the post-conviction court erred in denying relief on one of the grounds of ineffective assistance of counsel presented at the post-conviction hearing, asserting that trial counsel was ineffective in failing to utilize the Petitioner's daily calendars to establish a partial alibi. *See William Casey v. State*, No. E2017-01265-CCA-R3-PC, 2018 WL 2259182, at *4-5 (Tenn. Crim. App. May 17, 2018). This court affirmed the post-conviction court's denial of relief on this ground. *Id.* at *5. The Petitioner also asserted that the post-conviction court erred in dismissing seventy-two of his eighty-one claims prior to the evidentiary hearing. *Id.* at *2. This court determined that the Petitioner waived many of these claims due to his failure to adequately address the claims in his appellate brief or his failure to raise the claims on direct appeal. *Id.* at *2-3.

The Petitioner challenged the post-conviction court's order dismissing grounds of ineffective assistance of trial counsel in which he argued that trial counsel failed to:

(1) seek to exclude the Petitioner's North Carolina conviction pursuant to Tennessee Rule of Evidence 404; (2) request a jury instruction as to what constitutes being in a position of custodial or official authority; (3) move for a change of venue until the middle of jury selection; and (4) object to the State's actions in eliciting testimony from the victim regarding other sexual acts by the Petitioner and then electing the sexual act upon which to rely.

*Id.* at *4. The Petitioner also challenged the post-conviction court's order dismissing grounds of ineffective assistance of appellate counsel in which he argued that appellate counsel failed to raise issues on direct appeal regarding:

(1) the trial court's denial of the Petitioner's motion to exclude the Diocesan officials' testimony at trial and Ms. Sue Fra[z]ier-Bear's testimony at the hearing on the motion to dismiss; (2) the trial court's failure to exclude the testimony of Ms. Fra[z]ier-Bear and the Diocesan officials and the victim's written recollection of the incidents as hearsay; (3) the trial court's failure to rule on the Petitioner's motion under

Tennessee Rule of Evidence 609 prior to the State's presentation of the evidence; (4) the trial court's utilization of a jury panel that had been exposed to pretrial publicity; (5) the trial court's denial of the Petitioner's motion for a change of venue; (6) the trial court's admission of evidence of the victim's circumstances at the time of trial that was designed to create undue sympathy for the victim; (7) the trial court's admission of the victim's testimony of hearsay statements from his mother and the victim's opinion as to whether the Petitioner was an "authority figure"; (8) the trial court's admission of the victim's testimony regarding the response of his mother, his former wife, and another person to the victim's statements regarding the Petitioner; (9) the trial court's admission of the certified transcript of a conversation between the victim and the Petitioner in lieu of playing the actual audio recording; (10) the State's numerous amendments to the bill of particulars; (11) the trial court's failure to instruct the jury on the applicable statute of limitations; (12) the trial court's admission of evidence of death threats received by the victim; (13) the trial court's allowing a witness to remain in the courtroom during a hearing regarding the admission of the witness's testimony; (14) the trial court's admission of evidence of the Petitioner's silence in response to questioning by a Diocesan official; (15) the State's statements during closing arguments that the presumption of innocence had been lifted; (16) the trial court's admission of evidence of trips that the victim and the Petitioner took together; and (17) issues of plain error.

*Id.*

This court determined that the Petitioner failed to raise as a ground for relief in his petition that appellate counsel was ineffective in failing to challenge on direct appeal the trial court's admission of the certified transcript of the telephone call between the victim and the Petitioner in lieu of playing the actual audio recording and that, as a result, the Petitioner waived the issue. *Id.* This court noted that the State conceded that the post-conviction court erred in dismissing the remaining grounds of ineffective assistance of trial counsel and appellate counsel, and this court reversed the post-conviction court's dismissal of those grounds and remanded the case for an evidentiary hearing. *Id.*

During the evidentiary hearing on remand, the Petitioner presented the testimony of one witness, co-counsel, who represented the Petitioner at trial with co-counsel's father and another attorney and served as the lead attorney on appeal. Co-counsel testified that the motion for a new trial that he filed on behalf of the Petitioner was the most detailed and specific motion for new trial that he had ever filed. He stated that he raised every conceivable issue in the motion and that he determined the most important

issues to raise on appeal. Prior to filing an appellate brief on behalf of the Petitioner, co-counsel had a video conference with the Petitioner to review the brief, and the Petitioner agreed on the issues raised. The appellate brief filed by counsel on behalf of the Petitioner was entered as an exhibit.

Co-counsel testified that he did not recall that the trial court's failure to exclude Father Boettner's testimony was an issue that co-counsel believed had any merit "in the context of the overall appeal." Co-counsel did not believe that he raised the trial court's refusal to strike the testimony of Father Boettner on the grounds of hearsay or a violation of Tennessee Rule of Evidence 702 as a separate issue on appeal. Rather, the issue was encompassed within his argument regarding pre-accusatorial delay. Co-counsel recalled that the defense's position in the trial court was that Father Boettner never said that the Petitioner admitted to committing illegal acts in Sullivan County or during the time period specified in the presentment. Co-counsel did not raise as a separate issue on direct appeal that Father Boettner improperly bolstered the victim's testimony when Father Boettner could not testify that the Petitioner admitted the dates, times, and places of the offenses. Rather, co-counsel said the issue was encompassed in his argument that the trial court improperly denied the motion to dismiss.

Co-counsel testified that on direct appeal, he challenged the trial court's admission of the victim's "Memories" statement during the pretrial hearing as part of his argument that the trial court erred in failing to reopen the hearing. Co-counsel stated that he did not raise the admission of the "Memories" statement at trial as an issue on appeal because the "Memories" statement was not entered as an exhibit at trial but was only entered for identification purposes. Co-counsel said that while the document was used at trial to refresh the victim's recollection, co-counsel did not challenge this on appeal because he believed that such an argument would have been "frivolous."

Co-counsel testified that he did not raise the State's amending the bill of particulars as a separate issue on appeal but encompassed the argument within the two issues relating to the trial court's denial of the motion to dismiss and its refusal to reopen the hearing. Co-counsel recalled that whenever the defense raised issues in the trial court regarding the victim's changing the dates of the incidents, the trial court responded that the defense would be able to cross-examine the victim about the changes at trial. Co-counsel stated that the determination of whether the incidents occurred within the time frame set out in each count of the presentment was a factual issue for the jury. The trial court instructed the jury that the State was required to prove beyond a reasonable doubt that the offenses occurred within the time frames alleged in each count of the presentment.

Co-counsel testified regarding the difficulty of trying a case in 2011 based upon events that were alleged to have occurred between 1979 and 1980. He stated that at the time of the offenses, the victim's testimony was required to be corroborated and that the defense requested a jury instruction on the issue. The defense tried to "hammer" the corroboration issue at trial because they did not believe the State could meet its burden. Co-counsel explained that as a result, the State was allowed to introduce evidence to corroborate the victim's account. On direct appeal, co-counsel raised the trial court's failure to instruct the jury that the State was required to corroborate the victim's testimony. While the appeal was pending, the Tennessee Supreme Court released its opinion in *State v. Collier*, 411 S.W.3d 886, 898 (Tenn. 2013), abolishing the rule that victims of statutory rape qualify as accomplices for purposes of the corroboration rule. Co-counsel noted that this court applied *Collier* to the Petitioner's direct appeal and rejected co-counsel's argument that the application of *Collier* violated the prohibition against *ex post facto* laws. *See William Casey*, 2014 WL 325148, at *20-21.

Co-counsel recalled that prior to the Petitioner's deciding whether to testify at trial, the trial court excluded the Petitioner's North Carolina conviction as impeachment evidence pursuant to Tennessee Rule of Evidence 609. The defense also argued that the conviction was inadmissible under Rule 404, but the trial court stated that it was unable to determine that the conviction was "absolutely barred" because the court did not know what the Petitioner's testimony would be. Co-counsel stated that he raised the issue of the trial court's ruling in the motion for new trial but did not raise the issue on appeal.

Co-counsel recalled that the victim's testimony at trial about his impoverished condition was "fairly limited" when compared to his testimony during the pretrial hearing, and co-counsel did not raise the admission of this evidence as an issue on direct appeal. Co-counsel testified that the defense strategy at trial was to attack the victim's credibility through his inconsistent statements and his delay in reporting. Co-counsel explained that the defense strategy "open[ed] the door" to allow the victim to explain the reasons for the delay. Co-counsel also did not raise on direct appeal that the admission of evidence of the trips taken by the Petitioner and the victim created an impermissible inference of authority.

Co-counsel believed the victim testified at trial regarding his own belief about whether the Petitioner was an authority figure and did not testify that his mother told him that the Petitioner had authority over him. Co-counsel believed the victim testified that his mother was "fine with [the Petitioner] taking care of him." Co-counsel acknowledged that the victim's mother did not testify at trial and was not "unavailable" for hearsay purposes. Co-counsel did not raise an issue regarding the admissibility of the victim's testimony on appeal. Co-counsel stated that he did not raise any issues on appeal regarding the victim's testimony regarding what others told him after he disclosed the

abuse because such testimony explained the reasons for the victim's delay in disclosing the abuse to law enforcement. Co-counsel acknowledged that the defense did not request a jury instruction on the definition of "authority" as an element of the offenses and that he did not raise the trial court's failure to issue such an instruction on appeal.

Co-counsel stated that the defense objected at trial to the victim's testimony that the Petitioner told him that reporting the abuse would hurt the victim's mother. Co-counsel noted that the defense was able to clarify on cross-examination that the victim's mother would not be physically harmed but that she would be emotionally distraught due to her feelings about the Petitioner. Co-counsel did not raise the admission of the victim's testimony on direct appeal.

On cross-examination, co-counsel testified that when the trial was pending, co-counsel was practicing in Georgia and was in the process of moving to Tennessee to practice with lead counsel. He said he had conferences with the other attorneys and the Petitioner on a regular basis, during which they discussed defense strategies. Co-counsel agreed that the possible defense strategies were limited based upon the evidence and defense counsel's conversations with the Petitioner about the case.

Co-counsel agreed that he and the other defense counsel discussed with the Petitioner the Petitioner's meeting with Father Boettner and Deacon Smith. The Petitioner agreed that when he was presented with the victim's "Memories" document, he admitted to Father Boettner and Deacon Smith that he was guilty, but the Petitioner did not agree with the details set forth by the victim. Co-counsel testified that the Petitioner's response "was usually more focused on the lack of specifics" and was not "an overall denial." Co-counsel explained that the Petitioner disputed "immaterial" matters, such as the victim's recollection of where the furniture in the rectory was located, and that such disputes were "[t]hings that you really don't want to be focused on in front of a jury."

Co-counsel testified that he and other defense counsel prepared an outline of the Petitioner's possible testimony and reviewed it with the Petitioner prior to trial. Defense counsel explained to the Petitioner that he could not tell counsel one thing and then testify otherwise at trial. Co-counsel stated that the Petitioner decided against testifying at trial, and co-counsel believed the Petitioner did not want to offer "perjured" testimony.

Co-counsel said that the possible defenses were limited and that defense counsel had to exercise care to prevent opening the door to the admission of other evidence, such as the Petitioner's North Carolina conviction. Co-counsel explained that "[i]f one person says one thing and then you have multiple other witnesses that say your client admitted to something inappropriate, that's a very hard case to defend when your client has a conviction in North Carolina with the same alleged victim." With regard to the dispute of

the timing of the offense, co-counsel explained that "[t]he last thing you want to do in a jury trial is have your client trying to argue about dates" and that "not many juries are going to care too much about that if there's an admission of sexual abuse."

Co-counsel testified that the primary defense strategy was to attack the pre-accusatorial delay on due process grounds, which also encompassed an argument regarding the applicable statute of limitations. Co-counsel stated that defense counsel had the opportunity to create credibility issues by extensively cross-examining the victim during the hearing. Co-counsel also stated that defense counsel questioned the victim about his changing the dates that various incidents occurred, which co-counsel believed strengthened the defense's due process and statute of limitations arguments. Defense counsel submitted affidavits listing the names of potential witnesses who were deceased in an effort to establish that the pre-accusatorial delay resulted in prejudice.

Co-counsel agreed that the defense strategy at trial was to attempt to create reasonable doubt through the cross-examination of the victim and to attempt to establish that Ms. Brentwood was the "main instigator." Co-counsel stated that the defense also focused on the statute of limitations and was able to convince the trial court to instruct the jury that they must find that the offenses occurred within the time period specified in the presentment in order to convict the Petitioner.

Co-counsel testified that in upholding the trial court's refusal to issue a special jury instruction on coercion, this court held on appeal that the pattern instructions given by the trial court fully and fairly set out of the elements of the offenses. Co-counsel understood this holding as stating that all the jury instructions given were proper. He agreed that at the time of the offenses, the jury instructions did not include a specific instruction defining "authority." He stated that as a matter of strategy, he did not want to argue over the issue of "authority" because the Petitioner never denied having a personal relationship with the victim, being alone in the rectory with the victim, being allowed to take the victim on trips, and purchasing items for the victim, all of which were factors establishing authority. Co-counsel explained that he believed he would lose credibility with the jury by challenging the element of authority when the evidence supporting the element was overwhelming.

Co-counsel testified that he had prior appellate experience when he represented the Petitioner on direct appeal. He stated that he decided, as a matter of strategy and in order to maintain credibility with the appellate courts, to limit the issues raised on appeal to those he believed to be the strongest rather than taking a "shotgun approach." Co-counsel discussed this strategy with the Petitioner. Co-counsel stated that he raised many of the individual issues raised in the motion for new trial on direct appeal under the umbrella of the due process argument.

- 21 -

Following the evidentiary hearing, the post-conviction court entered an order denying the Petitioner's request for post-conviction relief. The post-conviction court credited the testimony of co-counsel, reviewed each claim, and found that the Petitioner failed to establish that his counsel were deficient at trial or on appeal and that any deficiency resulted in prejudice. The Petitioner appealed the post-conviction court's denial of relief to this court.

## ANALYSIS

On appeal, the Petitioner contends that he received ineffective assistance of counsel at trial and on appeal, that the post-conviction court erred in failing to rule on the Petitioner's motion in limine in which he sought to exclude the State and defense counsel from presenting any evidence protected by attorney-client privilege, and that the Petitioner is entitled to relief due to cumulative error. The Petitioner asserts that counsel were ineffective at trial in: (1) failing to seek or continue to seek exclusion of his North Carolina conviction at trial; (2) failing to request an instruction defining "position of custodial or official authority"; and (3) allowing the State to present evidence of other crimes and bad acts and failing to require an election from the State. The Petitioner also asserts that counsel were ineffective on appeal in failing to raise: (1) the trial court's refusal to exclude the testimony of Father Boettner; (2) the admission of Father Boettner's testimony regarding the Petitioner's "silence when confronted with questioning by a Diocesan official as being improper bolstering of the victim's testimony"; (3) the trial court's failure to strike Father Boettner's testimony as hearsay and/or under Tennessee Rule of Evidence 702; (4) the trial court's admission of the victim's written memory statement; (5) the trial court's failure to determine the admissibility of the Petitioner's North Carolina conviction pursuant to Tennessee Rule of Evidence 404; (6) the admission of testimony regarding the victim's economic condition; (7) the admission of the victim's testimony regarding hearsay statements made by his mother; (8) the admission of the victim's testimony regarding his subjective opinion as to the Petitioner's authority over him; (9) the admission of the victim's testimony regarding statements by his wife and "other third parties" about the Petitioner; (10) the State's "constant amendment" of the presentment and bill of particulars in order to have the charges fall within the then-existing statute of limitations; (11) the admission of evidence of "harm to the victim" due to his mother's relationship with the Petitioner; (12) the admission of evidence of trips taken by the Petitioner and the victim; and (13) "stand-alone" federal constitutional claims. The State responds that the Petitioner has failed to establish that he is entitled to relief. We agree with the State.

# I. Ineffective Assistance of Counsel

Under the Post-Conviction Procedure Act, a petitioner is entitled to relief when "the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The burden of proving allegations of fact by clear and convincing evidence falls to the petitioner seeking relief. T.C.A. § 40-30-110(f). The post-conviction court's findings of fact are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Accordingly, the reviewing court defers to the post-conviction court's findings regarding the credibility of witnesses, the weight and value of witness testimony, and the resolution of factual issues. *Id.* Questions of law and mixed questions of law and fact are reviewed de novo. *Id.* Each element of a claim of ineffective assistance of counsel is a mixed question of law and fact. *Id.*

Under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, the accused is guaranteed the right to effective assistance of counsel. *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016). To prevail on a claim that he was denied his constitutional right to effective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that the deficient performance caused prejudice to the defense. *Kendrick*, 454 S.W.3d at 457 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

Deficiency requires showing that counsel's errors were so serious "'that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Nesbit v. State*, 452 S.W.3d 779, 787 (Tenn. 2014) (quoting *Strickland*, 466 U.S. at 687). To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). Courts must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 689). "'[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)). In evaluating counsel's performance, "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Strickland*, 466 U.S. at 690-91). The reviewing court must begin with the presumption "that counsel

provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, absent the errors, the result of the proceeding would have been different. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Honeycutt*, 54 S.W.3d 762, 768 (Tenn. 2001) (quoting *Strickland*, 466 U.S. at 694). The petitioner must show that the deficiency deprived him of a fair trial and called the reliability of the outcome of the proceeding into question. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007). A claim may be denied for failure to establish either deficiency or prejudice, and the reviewing court need not address both components if a petitioner has failed to establish one. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

## A. At Trial

The Petitioner maintains that counsel were ineffective at trial in failing to seek "and/or" continue to seek to exclude evidence of his North Carolina conviction at trial. He argues that although the trial court ruled that the conviction could not be used for impeachment purposes pursuant to Tennessee Rule of Evidence 609, counsel should have sought a ruling on the admissibility of the evidence pursuant to Rule 404. The Petitioner further argues that by failing to seek such a ruling, counsel forced the Petitioner into a situation whereby he risked the admission of the conviction if he chose to testify.

As noted by the post-conviction court, counsel filed a motion prior to trial seeking to exclude the conviction pursuant to Rule 404(b) and Rule 609. The State announced that it would not seek to present the evidence in its case-in-chief, thus alleviating the need for a Rule 404(b) hearing. The trial court ruled that the conviction could not be presented for impeachment purposes pursuant to Rule 609 but noted the possibility that the Petitioner could open the door to the admissibility of the conviction based upon his testimony at trial. The Petitioner does not identify what further action counsel should have taken and, thus, failed to establish that counsel were deficient. Furthermore, although the Petitioner maintains that he would have testified at trial but for counsel's alleged deficiency, the Petitioner did not testify at the evidentiary hearing about what his testimony would have been had he taken the stand at trial. Accordingly, the Petitioner also failed to establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

The Petitioner contends that counsel were ineffective in failing to request a special jury instruction defining "position of custodial or official authority" as an element of the

charged offenses. The Petitioner, however, does not specify in his brief what language should have been included in the special instruction or otherwise how he believed the term should have been defined. Co-counsel testified that defense counsel decided against challenging the element of authority because they believed they would lose credibility with the jury by challenging an element that was overwhelmingly supported by the evidence. We agree with co-counsel that the evidence of the Petitioner's authority was overwhelming. The Petitioner has failed to present evidence establishing deficiency or prejudice.

Finally, the Petitioner maintains that counsel were ineffective at trial in failing to object to the State's admission of evidence of other crimes and bad acts. The Petitioner argues that counsel failed to object when the State questioned the victim on redirect examination regarding his statement to Detective Tincher in which the victim reported a separate incident of sexual contact that occurred in the Petitioner's car while parked inside the trailer park. The Petitioner also argues that counsel failed to require the State to elect the incidents upon which it was basing the charges in the presentment.

As noted by the State, however, the Petitioner never questioned co-counsel during the evidentiary hearing about the victim's statement to Detective Tincher and the incident of sexual contact that occurred in the Petitioner's car while parked in the trailer park. Such testimony from co-counsel is of particular importance because it was defense counsel who initially elicited testimony from the victim on cross-examination regarding the separate incident that occurred in the Petitioner's car. *See Christina Jones Thomas v. State*, No. E2018-01374-CCA-R3-PC, 2019 WL 5681479, at *10 (Tenn. Crim. App. Nov. 1, 2019) (recognizing that "cross-examination is a strategic and tactical decision of trial counsel which is not to be measured by hindsight") (citations omitted), *no perm. app. filed*. Furthermore, the trial court instructed the jury that as to Count Three, the State elected to rely upon the Petitioner's performing oral sex on the victim while in the victim's trailer, and the State specified during closing arguments the incidents upon which it was relying to support the charges in Count One and Count Two. Accordingly, the Petitioner has established neither deficiency nor prejudice.

### B. Ineffective Assistance of Counsel on Appeal

To establish ineffective assistance of counsel on appeal, the petitioner must prove that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent appellate counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Campbell v. State*, 904 S.W.2d 594, 957 (Tenn. 1995). "Appellate counsel are not constitutionally required to raise every conceivable issue on appeal," and the choice of which issues to raise rests within appellate counsel's discretion. *Carpenter v. State*,

126 S.W.3d 879, 887 (Tenn. 2004). "Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel." *Campbell*, 904 S.W.2d at 597. A reviewing court gives "considerable deference" to counsel's judgment regarding which issues to raise on appeal, so long as the choices are within the "range of competence required of attorneys in criminal cases." *Carpenter*, 126 S.W.3d at 887. "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome,'" although the Tennessee Supreme Court has declined to hold that this is the "*only* way to show" deficiency. *Id.* at 888 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). When a claim of ineffective assistance of counsel is premised on the failure to preserve an issue on appeal, the reviewing court should determine the merits of the issue. *Carperter*, 126 S.W.3d at 888. "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* The strength of the omitted issue also has bearing on whether failure to raise the issue resulted in prejudice. *Id.* The reviewing court may consider the following factors in determining whether omitting an issue on appeal was deficient:

> 1) Were the omitted issues "significant and obvious"?
> 2) Was there arguably contrary authority on the omitted issues?
> 3) Were the omitted issues clearly stronger than those presented?
> 4) Were the omitted issues objected to at trial?
> 5) Were the trial court's rulings subject to deference on appeal?
> 6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> 7) What was appellate counsel's level of experience and expertise?
> 8) Did the petitioner and appellate counsel meet and go over possible issues?
> 9) Is there evidence that counsel reviewed all the facts?
> 10) Were the omitted issues dealt with in other assignments of error?
> 11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Id.* at 888 (noting that the final factor reaches the ultimate issue of deficiency and "therefore is not helpful in deciding whether appellate counsel's performance was deficient").

As found by the post-conviction court, co-counsel, who had prior appellate experience, testified that he raised every possible issue in the motion for new trial. He then narrowed down the issues on appeal to those he believed to be the strongest rather than take a "shotgun approach." He explained that he believed that if he raised every

possible issue on appeal, he would lose credibility with the appellate courts. Co-counsel discussed this strategy and the issues to be raised on appeal with the Petitioner, who agreed with co-counsel. On direct appeal, co-counsel raised issues challenging the sufficiency of the evidence, the trial court's denial of the motion to dismiss due to "pre-accusatorial delay," the trial court's refusal to reopen the pretrial hearing, the trial court's denial of the request for special jury instructions defining "coercion" and requiring that the victim's testimony be corroborated, and the trial court's denial of a mistrial based upon comments by the trial court and the prosecutor. *See William Casey*, 2014 WL 325148, at *13-25. Co-counsel stated that some of the issues raised individually in the motion for new trial were encompassed in his arguments on appeal challenging the denial of the motions to dismiss and to reopen. During the evidentiary hearing, co-counsel was questioned regarding the various issues that he declined to raise, and he responded either that he raised the issues as part of other issues raised on direct appeal or that he did not believe the issues were viable.

### 1. The Admission of Father Boettner's Testimony

The Petitioner argues that co-counsel was ineffective in failing to raise on appeal the admission of Father Boettner's trial testimony that after the victim's memory statement was read to the Petitioner and he was asked whether the allegations were true, the Petitioner replied, "Unfortunately, but not all of the specifics." The Petitioner also challenges the admissibility of Father Boettner's trial testimony that the Petitioner responded, "Yes," when asked whether he masturbated the victim or had oral or anal sex with him. The Petitioner maintains that this evidence constituted proof of prior bad acts, that there was no indication that the acts to which he admitted occurred in Sullivan County, and that the State failed to elect the offenses upon which it was relying in response to the admission of these acts.

Co-counsel acknowledged that the defense challenged Father Boettner's testimony as not specific to the charges in the trial court. The "Memories" document, while not introduced at trial, included some of the instances of abuse that were subject to the charges upon which the Petitioner was being tried. Co-counsel explained that the defense also argued that the victim's testimony was required to be corroborated, which co-counsel believed was consistent with the law at the time of the offenses, and that as a result, the State was allowed to present evidence to corroborate the victim's testimony. As we have recognized, the State made a proper election of the offenses at trial. Furthermore, the Petitioner does not challenge the admissibility of Deacon Smith's testimony, which was consistent with Father Boettner's testimony at trial. The Petitioner has failed to establish that co-counsel's decision to omit the issue was unreasonable such that co-counsel was deficient in doing so or that there is a reasonable probability that

inclusion of the issue would have affected the result of the appeal. The Petitioner is not entitled to relief regarding this issue.

## 2. The Admission of Testimony of the Petitioner's Silence

The Petitioner maintains that co-counsel was ineffective in failing to challenge the admission of Father Boettner's testimony concerning the Petitioner's "silence when confronted with questioning by a Diocesan official as being improper bolstering of the victim's testimony."[1] It appears that what the Petitioner interprets as "silence" is his response of "Yes, unfortunately but not necessarily all the specifics," when asked whether there was any credibility to the victim's allegations. The Petitioner again argues that Father Boettner's testimony was not probative of whether the Petitioner committed the offenses in Sullivan County during the time period alleged in the presentment. Because the Petitioner's admission does not constitute silence, the Petitioner has failed to establish that co-counsel was deficient or that the omission of the issue was prejudicial.

## 3. The Admission of Father Boettner's Testimony as Improper Hearsay and in Violation of Tennessee Rule of Evidence 702

The Petitioner asserts that co-counsel was ineffective in failing to argue on appeal that the trial court erred in declining to exclude Father Boettner's testimony at trial "on the grounds of hearsay and/or violation of the precepts of TRE 702." The record from the trial reflects that the defense filed a motion seeking to exclude Father Boettner's testimony during the pretrial hearing on the basis of hearsay and a violation of Tennessee Rule of Evidence 702, and the trial court denied the motion. Co-counsel testified that he did not raise the issue as a stand-alone issue on appeal but included the issue in his argument challenging the trial court's denial of the motions to dismiss and reopen.

The Petitioner argues that Father Boettner's testimony at trial that the Petitioner was provided with a suspension letter at the conclusion of the meeting constituted inadmissible hearsay and violated Rule 702. The Petitioner offered no argument in either the post-conviction court or in his appellate brief, explaining how the testimony violates Rule 702, which governs testimony by expert witnesses. Therefore, this issue is waived. *See* Tenn. R. App. P. 27(a)(7)(A) (providing that an appellate brief shall include an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the

[1] In his appellate brief, the Petitioner refers to "the victim's silence" when confronted by Diocesan officials. However, his argument reflects that he is referred to his own "silence" rather than the victim's "silence."

record"); Tenn. Ct. Crim. App. R. 10(b) (providing that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"). With respect to the Petitioner's hearsay claim, we note that he never questioned co-counsel during the evidentiary hearing regarding his decision against challenging the admission of this testimony on direct appeal. Furthermore, Father Boettner's testimony regarding the suspension letter was first elicited by defense counsel on cross-examination at trial. The Petitioner has failed to establish that co-counsel was deficient in declining to raise the issue on direct appeal or that the inclusion of a challenge to testimony regarding the Petitioner's receipt of a letter would have affected the result of the appeal.

### 4. Admission of the Victim's "Memories" Statements

The Petitioner asserts that co-counsel was ineffective in failing to challenge on direct appeal the trial court's admission of evidence of the victim's "Memories" statements during the pretrial hearing and at trial. However, in the Petitioner's memorandum of law filed in the post-conviction court after the case was remanded for a new evidentiary hearing, the Petitioner limited his argument to the admission of the evidence at trial. Furthermore, the record reflects that defense counsel entered one version of the victim's "Memories" statement into evidence at the pretrial hearing and utilized it to argue that the victim changed the dates in which he alleged that the offenses occurred in order to prevent the offenses from falling outside the applicable statute of limitations. Thus, the Petitioner has failed to establish that co-counsel was deficient in failing to challenge the admission of evidence that counsel chose to present. He is not entitled to relief regarding the omission on appeal of the issue regarding the pretrial hearing.

As found by the post-conviction court, the victim's "Memories" statement was not entered as an exhibit at trial. The Petitioner did not identify in his appellate brief the testimony that he claimed was improperly presented and, thus, waived the issue. *See* Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). Although the Petitioner argues that the memory statement was improperly used at trial to refresh the victim's recollection, co-counsel testified at the post-conviction hearing that he did not challenge the use of the memory statement on appeal because he believed its use was proper and that any argument challenging its use would have been "frivolous." The Petitioner has failed to establish otherwise. Accordingly, co-counsel was not deficient in failing to raise the issue on appeal.

### 5. Failure to Hold a Hearing Regarding the Admissibility of the North Carolina Conviction

The Petitioner maintains that co-counsel was ineffective in declining to raise on direct appeal the trial court's failure to hold a hearing regarding the admissibility of the Petitioner's North Carolina conviction pursuant to Tennessee Rule of Evidence 404(b). However, in remanding the case to the post-conviction court, this court did not identify this issue as one of the issues properly preserved by the Petitioner. *See William Casey*, 2018 WL 2259182, at *4. Accordingly, this issue is waived.

### 6. Admission of Evidence of the Victim's Economic Condition

The Petitioner asserts that co-counsel was ineffective in failing to challenge on direct appeal the admission of evidence of the victim's economic condition as creating undue sympathy. The Petitioner failed to include in his brief any citations to the record and instead asserted that such testimony "is replete throughout the whole of the transcript of the original trial, and, thus, too numerous and space-consuming to cite all the examples herein." However, the Petitioner is required to set forth the testimony that he is challenging and to include specific citations of the record. *See* Tenn. R. App. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). We decline to conduct an archeological dig through the extensive trial record to locate any testimony that might be deemed objectionable and determine whether counsel preserved the issue for direct appeal by objecting to the admission of the testimony as creating undue sympathy when the Petitioner has made no effort to do so. Rather, we conclude that the issue is waived.

### 7. Admission of the Victim's Testimony Regarding Statements by His Mother

The Petitioner argues that co-counsel was ineffective in failing to raise on direct appeal the admission of the victim's testimony regarding statements made by his mother as inadmissible hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802.

The Petitioner asserts that co-counsel should have challenged the victim's testimony regarding his mother's statements to him about her relationship with the Petitioner. The trial record reflects that when the State sought to elicit testimony from the victim regarding his mother's statements to him in which she claimed to have a romantic relationship with the Petitioner, counsel objected to the testimony as hearsay, and the trial court sustained the objection. Instead, the victim testified that based upon his observations, he believed that his mother and the Petitioner had a close relationship. The

victim's testimony of his perception of the relationship between his mother and the Petitioner does not fall within the definition of hearsay. *See* Tenn. R. Evid. 801(c). The Petitioner does not challenge the admission of the recording of the telephone call between the victim and the Petitioner during which the victim informed the Petitioner about his mother's claims and the Petitioner denied ever having a romantic relationship with the victim's mother. The Petitioner failed to establish that co-counsel was deficient in declining to pursue the issue on direct appeal.

The Petitioner faults co-counsel for failing to challenge on direct appeal the victim's testimony of his mother's statements regarding the Petitioner's authority over the victim. Co-counsel stated that the victim testified at trial about his own belief regarding whether the Petitioner was an authority figure and that the victim did not testify that his mother told him that the Petitioner had authority over him. The Petitioner does not cite to any portion of the trial record to support his claim that the victim testified that his mother informed him that the Petitioner had authority over him. The Petitioner has established neither deficiency nor prejudice.

Finally, the Petitioner asserts that the victim's testimony that his mother encouraged a relationship between the victim and the Petitioner was inadmissible hearsay and that co-counsel was ineffective in failing to challenge the admission of the evidence on appeal. The Petitioner maintains that the State improperly utilized this evidence to establish his authority over the victim. However, co-counsel testified that he believed the evidence establishing the Petitioner's authority over the victim was overwhelming, and we agree with co-counsel's assessment of the evidence. Instead, co-counsel chose to focus upon the issues he believed to be the strongest. Given the issues that co-counsel raised on direct appeal and his assessment of the overwhelming evidence establishing the Petitioner's authority over the victim, we cannot conclude that co-counsel's decision to omit the issue was unreasonable such that co-counsel was deficient in doing so or that there is a reasonable probability that inclusion of the issue would have affected the result of the appeal.

### 8. The Admission of the Victim's Testimony About the Petitioner's Authority

The Petitioner maintains that co-counsel was ineffective in failing to challenge on direct appeal the victim's "subjective opinion" that the Petitioner had authority over him. However, the Petitioner has waived this claim because he failed to include in his appellate brief any basis as to why such testimony was inadmissible or any authority to support his claim. *See* Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).

### 9. The Admission of the Victim's Testimony About Statements Made by Others

The Petitioner contends that co-counsel was ineffective in failing to raise on direct appeal the admission of the victim's testimony about "statements that his wife and other third parties had made concerning the [P]etitioner." The Petitioner, however, did not identify in his appellate brief the testimony that he asserts should have been challenged on direct appeal or otherwise cite to the record to support his claims. Accordingly, this issue is waived. *See* Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).

### 10. The State's Amendment to the Bill of Particulars

The Petitioner asserts that co-counsel was ineffective in failing to challenge "the constant amendment of the indictment/bill of particulars by the State, in order to have the charges for which the [P]etitioner was indicted fall within the then-existing statutes of limitations." Co-counsel testified that although he did not raise the multiple amendments of the bill of particulars as a separate issue on direct appeal, he incorporated the arguments into his claim on appeal that the pre-accusatorial delay violated the Petitioner's due process rights. The appellate brief that counsel filed on behalf of the Petitioner was entered as an exhibit during the post-conviction hearing and supported co-counsel's testimony.

The issue of the amendments to the victim's "Memories" statement upon which the amendments to the bill of particulars were based and the impact of the statute of limitations was litigated by counsel extensively prior to trial. The trial court found no evidence suggesting that the victim modified his "Memories" statements in order to prevent the offenses from being barred by the statute of limitations. Rather, the victim testified during the pretrial hearing that he modified his "Memories" statements whenever he was able to recall further details as a result of therapy. Given the lack of evidence establishing that the victim modified his statement in order to prevent the offenses from being barred by the statute of limitations, we cannot conclude that co-counsel's decision to omit the issue as a stand-alone claim and to incorporate it into his due process argument was unreasonable such that co-counsel was deficient or that there is a reasonable probability that inclusion of the issue as a stand-alone claim would have affected the result of the appeal.

### 11. Admission of Evidence of Harm to the Victim

The Petitioner challenges co-counsel's failure to include as an issue on direct appeal "the trial court's admission of evidence of harm to the victim, supposedly due to his mother's alleged relationship with [the Petitioner]." The Petitioner asserts that the victim's "testimony showing real or perceived harm that would come to him if he,

somehow, disclosed this relationship, which came from statement[s] his mother made and were not assertions by [the Petitioner]," was irrelevant and designed to create sympathy. While this court identified counsel's failure to raise an issue regarding "death threats" received by the victim as one of the claims of ineffective assistance of appellate counsel to be addressed on remand, this court did not identify counsel's failure to challenge evidence of harm to the victim based on his mother's statements as an issue to be addressed during the evidentiary hearing on remand. *See William Casey*, 2018 WL 2259182, at *4. Furthermore, the Petitioner's appellate brief fails to include appropriate references to the record such that the testimony about which the Petitioner complains may be identified. *See* Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). Therefore, this issue is waived.

### 12. The Admission of Evidence of Trips

The Petitioner argues that co-counsel was ineffective in failing to challenge the admission of evidence of trips taken by the Petitioner and the victim. The Petitioner maintains that the trips constituted evidence of prior bad acts and were irrelevant. Contrary to the Petitioner's claims, counsel did not object to the evidence of the trips at trial as constituting improper bad act evidence and otherwise irrelevant. Rather, counsel's objection was limited to the evidence that the Petitioner and the victim slept in the same bed during the trips. The trial court overruled counsel's objection, finding that the evidence did not constitute bad acts and agreeing with the State that the evidence was relevant to the issue of authority. By failing to object to the evidence of the trips, counsel waived plenary review on direct appeal. *See* Tenn. R. App. P. 36(a); *State v. Smith*, 24 S.W.3d 274, 279-80 (Tenn. 2000). Rather, had counsel challenged the admission of the evidence on direct appeal, this court's review would have been limited to plain error.

For an error to constitute plain error sufficient to merit relief, the following factors must be present:

> (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

*State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Additionally, "'the plain error must be of such a great magnitude that it probably changed the outcome'" of the proceeding. *Id*. (quoting *Adkisson*, 899 S.W.2d at 642). This court need not consider all the factors if it is clear

that the defendant will fail to establish at least one. *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010).

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait" but may be admissible for other non-propensity purposes. Tenn. R. Evid. 404(b) & Advisory Comm'n Cmts. Rule 404(b) applies only to evidence of "bad acts." *State v. Clark*, 452 S.W.3d 268, 289 (Tenn. 2014). Testimony about relevant behavior that does not constitute a crime or a bad act is not analyzed under Rule 404(b). *State v. Reid*, 213 S.W.3d 792, 814 (Tenn. 2006) (concluding that possession of a gun, standing alone, does not constitute a crime and that, therefore, evidence of ownership of a gun is not a bad act). Behavior that, while not criminal, constitutes a "moral 'wrong'" also must meet the requirements of Rule 404(b). *Clark*, 452 S.W.3d at 289 (categorizing possession of pornography as potentially being perceived as a "moral wrong" by some members of society).

The Petitioner failed to establish that the admission of the evidence breached a clear and unequivocal rule of law as to rise to the level of plain error. *See Bishop*, 431 S.W.3d at 44. The Petitioner failed to demonstrate that the evidence of the trips, standing alone, constituted bad act evidence subject to the requirements of Rule 404(b). Co-counsel recognized that the trips were relevant to the issue of Petitioner's authority over the victim, and we agree that the evidence was relevant for this purpose. *See* Tenn. R. Evid. 401. We cannot conclude that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. Because the admission of the evidence did not rise to the level of plain error and in light of the issues raised by counsel on direct appeal, we hold that co-counsel was not deficient in declining to challenge the admission of the evidence on direct appeal and that the omission of the issue did not result in prejudice.

### 13. "Stand-Alone" Federal Constitutional Claims

The Petitioner asserts that co-counsel was ineffective in failing to assert "stand-alone" federal constitutional claims. The Petitioner argues that although co-counsel raised a due process claim under the Tennessee Constitution, he failed to raise a due process claim under the United States Constitution. This court did not identify this issue as one to be addressed during the evidentiary hearing on remand. *See William Casey*, 2018 WL 2259182, at *4. Therefore, this issue is waived.

## II.  Motion in Limine

Prior to the evidentiary hearing, the Petitioner filed a motion in limine in which he sought to prevent the State and co-counsel from introducing any evidence protected by attorney-client privilege.  No other reference to this motion is included in the appellate record.  The Petitioner asserts that the post-conviction court failed to rule on the motion and that its failure to do so rose to the level of plain error.  The State responds that the Petitioner has failed to establish that he is entitled to plain error relief.  We agree with the State.

The appellate record fails to clearly establish what occurred in the post-conviction court.  *See Bishop*, 431 S.W.3d at 44.  Although the Petitioner filed the motion in limine, his post-conviction counsel never mentioned the motion during the evidentiary hearing and never objected to any portion of co-counsel's testimony as protected by attorney-client privilege.  Given the absence of any additional references to the motion in the appellate record, it is unclear whether the post-conviction court failed to rule on the motion or whether the Petitioner simply abandoned the motion.

The Petitioner also has failed to establish that the post-conviction court breached a clear and unequivocal rule of law by not excluding portions of co-counsel's testimony as protected by attorney-client privilege.  *See id.*  The Petitioner complains that co-counsel testified to his conversations with the Petitioner that "could be construed in a particular manner as [the Petitioner's] having admitted culpability to the crimes charged."  "If the client attacks the competency of his attorney, the [attorney-client] privilege is viewed as waived regarding the representation in issue."  *Bryan v. State*, 848 S.W.2d 72, 80 (Tenn. Crim. App. 1992); *see Richard Lloyd Odom v. State*, No. W2015-01742-CCA-R3-PD, 2017 WL 4764908, at *47 (Tenn. Crim. App. Oct. 20, 2017).  As recognized by this court,

> "To the limited extent of the issue raised by the petitioner regarding his [attorney's representation], an implied waiver of privilege would be appropriate upon the state's showing that the information possessed by the trial attorney was vital to its defense in the post-conviction action.  A post-conviction case is not a criminal prosecution, but is a means to address a petitioner's allegations of constitutional wrongdoing in a previous convicting or sentencing process.  However, once a petitioner alleges and seeks to prove constitutional error, the state should be entitled to prove the absence of such error.  Fairness in the judicial process demands no less."

*Richard Lloyd Odom*, 2017 WL 476908, at *47 (quoting *Bryan*, 848 S.W.2d at 81).

In claiming ineffective assistance of counsel, the Petitioner attacked counsel's failure to seek to exclude his North Carolina conviction pursuant to Tennessee Rule of Evidence 404(b) and maintained that he would have testified at trial but for counsel's alleged deficiency.  In order to defend the claim, the State was allowed to question co-counsel about the Petitioner's reasons for choosing not to testify, which were based in part on the Petitioner's statements to co-counsel regarding his culpability.  Therefore, the Petitioner waived his attorney-client privilege in this respect.  *See Richard Lloyd Odom*, 2017 WL 476908, at \*47 (holding that a petitioner waived his attorney-client privilege related to his statements to trial counsel when the petitioner alleged in post-conviction proceedings that trial counsel was ineffective in failing to conduct an adequate investigation and the scope of the investigation was based, in part, upon the petitioner's statements to trial counsel).  The Petitioner has failed to establish plain error and, therefore, is not entitled to relief on this issue.

## III.  Cumulative Error

Finally, the Petitioner contends that the individual errors he alleged in support of post-conviction relief, when examined cumulatively, entitle him to a new trial.  The cumulative error doctrine applies only where there has been more than one actual error, which the Petitioner has failed to establish.  *See State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010).  Therefore, he is not entitled to relief.

## CONCLUSION

The Petitioner has failed to establish that he is entitled to post-conviction relief.  Accordingly, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE